**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

THERESA CLEAVLAND,

                              Plaintiff,

v.                                                          No. 04-CV-950
                                                                 (LEK/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

_____

**APPEARANCES:**                              **OF COUNSEL:**

STEPHEN J. MASTAITIS, JR., ESQ.
Attorney for Plaintiff
1412 Route 9P
Saratoga Springs, New York 12866

HON. GLENN T. SUDDABY                 WILLIAM H. PEASE, ESQ.
United States Attorney for the             Assistant United States Attorney
  Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff Theresa Cleavland ("Cleavland") brought this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying her application for benefits under the Social Security Act.

Cleavland moves for a finding of disability and the Commissioner cross-moves for a

_____

        [1]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

judgment on the pleadings. Docket Nos. 7, 8.  For the reasons which follow, it is recommended that the Commissioner's decision be reversed, Cleavland's motion for a finding of disability be granted, and the Commissioner's cross-motion be denied..

## I. Procedural History

On May 13, 1999, Cleavland filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 92-94.[2] That application was denied after the initial determination and following reconsideration. T. 28-31, 34-36. Cleavland requested a hearing before an administrative law judge (ALJ), T. 24, which was held before ALJ Carl  E. Stephan on May 24, 2000.  T. 531-95. In a decision dated October 27, 2000,  the ALJ denied Cleveland's claims. T. 51-95. Cleavland's second application for benefits dated December 22, 2000 was consolidated with her May 1999 application. T. 14. In October 2002,  the Appeals Council remanded the ALJ's decision for further review. T. 62-65. A second hearing was convened on October 2, 2003 and on October 14, 2003, the ALJ again denied Cleavland's claims. T. 11-23. On June 17, 2004, the Appeals Council denied Cleavland's request for review, thus making the ALJ's findings the final decision of the Commissioner. T. 4-7.  This action followed.

---

[2] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 6.

## II. Contentions

Cleavland contends that the ALJ erred when he discredited the opinion of her treating physicians, discredited her complaints of pain, failed properly to evaluate her mental capacity, and found her capable of performing sedentary work. The Commissioner contends that there was substantial evidence to support the determination that Cleavland was not disabled.

## III. Facts

Cleavland is currently forty-six years old, previously worked as a cashier, clerk, and bookkeeper, and has a general equivalency diploma. T. 50, 537-38, 563. Cleavland alleges that she became disabled on October 20, 1998 due to hip, low back, and groin injuries and depression. T. 106, 131.

## IV.  Standard of Review

### A. Disability Criteria

A claimant seeking disability benefits must establish that "he [or she] is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2003).  In addition, the claimant's impairments must be of such severity that he or she is not able to do previous work or any other substantial gainful work considering the claimant's  age, education, and work experience, regardless of whether

3

such work exists in the immediate area, whether a specific job vacancy exists, or whether

the claimant would be hired if he or she applied for work. 42 U.S.C. § 1382c(a)(3)(B)

(2003).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 416.920, to

evaluate SSI disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in
> substantial gainful activity.  If he [or she] is not, the [Commissioner] next
> considers whether the claimant has a 'severe impairment' which significantly
> limits his [or her] physical or mental ability to do basic work activities.  If the
> claimant suffers such an impairment, the third inquiry is whether, based solely on
> medical evidence, the claimant has an impairment which is listed in Appendix 1
> of the regulations.  If the claimant has such an impairment, the [Commissioner]
> will consider him [or her] disabled without considering vocational factors such as
> age, education, and work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to perform his [or
> her] past work.  Finally, if the claimant is unable to perform his [or her] past work,
> the [Commissioner] then determines whether there is other work which the
> claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see 20 C.F.R. § 416.920 (2005).

The plaintiff has the burden of establishing disability at the first four steps. Shaw v.

Chater, 221 F.3d 126, 132 (2d Cir. 2000).  However, if the plaintiff establishes that an

impairment prevents him or her from performing past work, the burden then shifts to the

Commissioner to determine if there is other work which the claimant could perform.  Id.

4

**B. Scope of Review**

The reviewing court must determine if the commissioner has applied the proper legal standards and if the decision is supported by substantial evidence.  Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw, 221 F.3d at 131 (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000). The ALJ must elaborate specific factors to allow the reviewing court to determine whether substantial evidence supports the decision. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  If the Commissioner's finding is supported by substantial evidence, it is conclusive and on review, the court cannot substitute its interpretation of the administrative record for that of the Commissioner.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998); Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996)

**V.  Discussion**

**A. Medical Evidence**

On October 29, 1998, Cleavland fell at work injuring her left hip, back, and groin. T. 537.  X-rays of the lumbar spine, pelvis, and left hip were unremarkable. T. 164, 381. Dr. Robert G. Selling opined that Cleavland's continued complaints of pain were mainly muscular and prescribed Amitriptyline. T. 162. In December 1998, an MRI of the lumbar spine revealed minimal disc bulging with no evidence of disc herniation, no encroachment

on the neuraforamina, and no spinal stenosis. T. 165. In December 1998,  a CT scan

showed no significant abnormalities of the lumbar spine. T. 166.

On January 21, 1999, Cleavland presented to the emergency room with complaints

of severe back pain with radiation down the left leg, the impression was low back pain

secondary to muscle spasms with trigger points, and Cleavland was treated with epidural

injections. T. 161. On June 7, 1999, Cleavland's chiropractor opined that Cleavland was

temporarily totally disabled and that she could sit, walk, and stand six hours per day, was

limited in pushing and pulling, and had no other limitations. T. 244-48.

On July 1, 1999, Cleavland was examined by Dr. William S. Bronk.  Cleavland did

not walk with a limp, there were no abnormal curvatures of the back, she could bend

forward 30º,  there was no visible mobility with hyperextension or lateral bending

movements, she could perform alternative toe-and-heel walking without evidence of gross

motor weakness in either lower extremity, knee and ankle reflexes were intact, and

straight-leg raising was negative. T. 251-52.  X-rays of the lumbar spine showed excellent

preservation of all disc spaces with no evidence of arthritic changes or traumatic injury and

x-rays of the hip were normal. T. 252. The impression was chronic low back strain with

limited lumbar mobility and no hip pathology. T. 251-52.  Dr. Bronk opined that Cleavland

was capable of an alternately sedentary and walk-around type job with a restriction from

bending and lifting ten pounds. T. 251-52.

A physical residual functional capacity (RFC) assessment completed on October

21, 1999 found that Cleavland could occasionally lift and carry ten pounds, could

frequently lift and carry less than ten pounds, could stand and walk two hours and sit six

6

hours, and was unlimited in pushing and pulling. T. 253-60.

Dr. Frederic I. Fagelman treated Cleavland from June 1987 to August 2001. Cleavland complained of neck pain which radiated into the arm with tingling. Cleavland had marked restricted neck motion and multiple points of tenderness, objective neurological examination in the upper extremities was normal, reflexes were equal, sensation was basically intact, motor strength was basically normal, and there was no evidence of any spinal cord problem or problem with the lower extremities. T. 284. The impression was chronic neck and arm problems. T. 284. An MRI was normal and x-rays showed scoliosis. T. 282. A peripheral neurological examination was essentially normal for motor strength, sensation, and reflexes, straight-leg raising was positive at 40º and there was a question of radiculopathy. T. 282.

On May 3, 1999, Dr. Fagelman noted that there was marked limited back motion, straight-leg raising produced back pain at 20º, there was subjective diminished pin prick n the left foot, no sensory loss, equal reflexes, and motor strength was intact. T. 280. The impression was lumbrosacral strain with a possible facet syndrome and there was no need for further neurosurgical testing or surgery.  T. 432. Dr. Fagelman recommended a pain clinic. T. 281. On August 22, 2001, Dr. Fagelman found that Cleavland was permanently, totally disabled. T. 426. On June 11, 2003, an MRI showed an idiopathic leftward curvature of the lumbar spine and degenerative disc bulging at L2-3, L3-4 and L4-5. T. 462.

Dr. Rosyln Socolof treated Cleavland from October 1998 until  December 2002 as her general physician. T. 353-64, 451-58. X-rays of the cervical and thoracic spine taken

on December 7, 2000 showed no evidence of bone, disc space or soft tissue pathology, and no evidence of fracture or apparent interval change. T. 372. An MRI taken on December 5, 2000 showed a slight curvature of the upper dorsal spine convex to the right and low dorsal spine convex to the left, and no fracture, lystic lesion, or balstic lesion. T. 374.

On June 16, 2003, Dr. Socolof found that Cleavland had a marked degree of limitation in activities of daily living, maintaining social functioning, a constant degree of limitation in deficiencies of concentration, persistence or pace, and repeated episodes of deterioration or decompensation in work settings. T. 465-67. Dr. Scolof found that Cleavland could sit up to one-half hour continuously for a total of three-to-four hours, could not stand or walk, could never lift or carry, could not bend or squat occasionally, could never climb or reach, and could not push or pull with her hands, legs, or feet. T. 470. Motor nerve conduction studies were abnormal and showed electrophysiological evidence of mild chronic changes in C-5 and C-6 supplied muscles on right. T. 478.  On September 26, 2003, a lumbar myelogram was unremarkable. T. 502.  On September 26, 2003, a CT lumbar myelogram showed minimal concentric  bulging at the L3-4 and L4-5 levels with no disk herniation. T. 503-04.

David Pronto, PAC and Dr. Charles Gordon treated Cleavland for pain management from July 1999 until January 2002. T. 262-65, 384-402, 434-43. Cleavland complained of severe pain which interfered with every aspect of her life and which radiated into her left leg. T. 264, 395. Cleavland's current medications included Vistaril, Vicodin, norco, soma, PLO gel, Trazadone and Flexeril, she used a TENS unit, had

whirlpool therapy, and walked with a cane. T. 262, 392-95, 424. There was no significant tenderness over the lower back and hip, some paraspinous muscle tenderness bilaterally, sacroiliac joints were non-tender, straight leg raising was negative, reflexes were diminished in the upper and lower extremities, and Cleavland's back range of motion was limited. T. 262-65. A mental status examination showed that Cleavland was dysphoric, that cognitive function was grossly intact, and Cleavland reported significant depressive symptomatology. T. 262. On September 25, 1999, Cleavland underwent an epidural steroid injection. T. 261. In April 2001, Cleavland underwent facet medial branch nerve blocks and sacroiliac joint injections which did not provide significant pain relief. T. 388, 394. Pronto opined that Cleavland had possible facet joint disease[3] and sacroiliac disease.[4] T. 387.

On November 16, 1999, William H. Clements, Ph.D. conducted a psychiatric examination of Cleavland. T. 285-87. Speech was within normal limits, mood was dysphoric with affect appropriate but somewhat constricted, insight, common sense and social judgment were limited, Cleavland was oriented in three spheres, she was able to perform serial sevens, immediate memory was somewhat limited, and she could recall two of five items.  T. 286. The diagnosis was adjustment disorder with depressed mood,

---

[3] "A disease involving the facet of a joint, as the facet of a vertebra." 2-F SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE 36 (2004).

[4] "Any disease involving one or both of the sacroiliac joints. The sacroiliac joints are in the back of the pelvis or hips. The pelvis is formed by the two rounded but irregularly shaped hip bones which are united directly in front. In the back, they fail to meet and leave a wedge-shaped gap, with the wider side up. Into this gap is fitted the sacrum, the lower part of the spine, as a keystone fits into an arch. " 5-S SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE 177 (2004).

secondary to medical problems. T. 286.

A psychiatric review technique form found that Cleavland had no severe impairment. T. 288-96. A social and psychiatric history and assessment form completed on June 5, 2000 found that Cleavland was orientated times three, had problems with memory, her intellectual functioning was average, that her insight and judgment were intact, that she was depressed, and that she had a functional disability due to mental illness in self-care, self-direction, social functioning, and ability to concentrate. T. 306-10.

On June 19, 2000, Dr. John M.W. Nicholson conducted a psychiatric evaluation of Cleavland. T. 313. Cleavland complained of depression, inability to concentrate, problems sleeping, and poor appetite, and she related a background of physical and sexual abuse. T. 315.  There was no suicidal ideation, no past gestures, no hallucinations, her thoughts were logical and goal-directed with no circumstantial or tangential thinking present. T. 316. The diagnosis was a recurrent, moderate, major depressive disorder and posttraumatic stress disorder. T. 316. Cleavland was started on serzone for depression and therapy was recommended. T. 317.

In July 2000, Dr. North diagnosed Cleavland with depression and back and leg pain secondary to lumbar disc disease. Dr. North found that Cleavland had to lie down three to four times a day for twenty minutes to two hours due to pain, and that the prognosis was poor. T. 302. Dr. North found that Cleavland could sit, stand and walk up to fifteen minutes continuously for a total of eight hours. T. 302. Dr. North also found that Cleavland could frequently lift and carry up to five pounds but could never lift more than five pounds, that she could never bend, squat, climb, or reach, that she only had the use of her radial

fingers, and could not use her legs or feet for pushing and pulling. T. 303.

In August 2000, Cleavland presented to Glens Falls Hospital Emergency Room for episodic tachycardia. T. 318. Cleavland had been experiencing rapid heart rates for over ten years. T. 320. Dr. Peter Grey examined Cleavland  and found a regular rate and rhythm with occasional sinus arrhythmia, subtle diastolic rumble, no systolic murmur, gallop or rub, and apical impulse was non-displaced without heave or thrill. T. 318. An EKG revealed sinus rhythm at a rate of sixty with normal axis and indices with a minor right ventricular conduction delay. T. 310. The impression was supraventricular tachychia and mild-to-moderate thickened mitral stenosis. T. 319. On November 10, 2000, a nuclear stress test was negative with no evidence of significant ischemic coronary heart disease. T. 336. On May 31, 2000, an echocardiogram revealed calcification of the mitral valve leaflets and annulus with mild stenosis and mild insufficiency, a normal appealing left ventricular systolic function, and no significant change since July 1990. T. 378.

In June 2001, Dr. George Hazel conducted an independent medical examination for the New York Workers' Compensation Board. T. 224-25. The diagnosis was chronic low back strain, post-traumatic in origin, and opined that Cleavland had reached maximum medical improvement causally related to the October 1998 injury. T. 425. Forward flexion was 35º, extension was 10º, range of motion of the back was limited, and straight leg raising was poor. T. 425.

On March 7, 2002, Dr. Hale found that Cleavland's impairment met the medical listing of 1.05C, Disorders of the Spine due to pain, muscle spasm, and significant limitation of motion in the spine, with appropriate radicular distribution of significant motor

11

loss with muscle weakness and sensory and reflex loss. T. 299.

## B. Treating Physician's Rule

Cleavland contends that the ALJ erred when he discredited the opinion of Dr. Socolof, her treating physician. The Commissioner contends that Dr. Socolof's opinion was not entitled to controlling weight.

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. Harris v. Railroad Retirement Bd., 948 F.2d 123, 126 (2d Cir. 1991). Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); Shaw v. Chater, 221 F.3d 126,134 (2d Cir. 2000). Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord that opinion: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. Schaal, 134 F.3d at 504. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or

12

conclusive, and the less consistent is the opinion, the less weight it will be given. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e) (2004).

Dr. Socolof  treated Cleavland from October 1998 until  December 2002 as her general physician. T. 353-64, 451-58. Dr. Socolof found a marked degree of limitation in activities of daily living, maintaining social functioning, a constant degree of limitation in deficiencies of concentration, persistence, and pace, and repeated episodes of deterioration and decompensation in work settings. T. 465-67. Dr. Socolof found that Cleavland could sit up to one-half hour continuously for a total of three-to-four hours, could not stand or walk, could never lift or carry, could not bend or squat, could never climb or reach, and could not push or pull with her hands, legs, or feet. T. 470.

The ALJ found that Dr. Socolof's opinion as to Cleavland's mental impairment was out of proportion with the opinions of the mental health professionals and added that he had no specialized training in psychiatric treatment or diagnosis. T. 18. The ALJ rejected Dr. Socolof's opinion as to Cleavland's physical limitations as out of proportion to the objective clinical and laboratory findings and rendered the entire report not credible. T 19. The ALJ added that if this opinion were accepted, Cleavland would be expected to be bedridden, institutionalized, in need of a wheelchair, would have prevented her from attending the hearing, and that Dr. Socolof's opinion was an extreme exaggeration intended to assist Cleavland in obtaining benefits. T. 20. The ALJ gave this opinion little or no weight in arriving at Cleavland's RFC. T. 20.

13

There is other evidence in the record to support Dr. Socolof's conclusion that Cleavland was not capable of substantial gainful activity. Dr. Hazel, an examining physician, found the range of motion of Cleavland's back was limited, straight-leg raising was poor, and he opined that Cleavland had reached maximum medical improvement. T. 425. Dr. Fagelman, also a treating physician, likewise found marked limited back motion, straight-leg raising produced back pain at 20°, found subjective diminished pin-prick in the left foot, and found that Cleavland was permanently, totally disabled. T. 280, 426. Moreover, a reviewing physician  found that Cleavland's impairment met the medical listing of 1.05C, Disorders of the Spine, due to pain, muscle spasms, and significant limitation of motion in the spine, with appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss. T. 299.

Cleavland sought treatment consistently from the pain clinic, underwent motor nerve conduction studies, MRIs, myelograms, and CT scans. Cleavland's medications included Vistaril, Vicodin, norco, soma, PLO gel, Trazadone and Flexeril, she used a TENS unit, underwent several epidural steroid injections, underwent nerve blocks, had whirlpool therapy, chiropractic care, and walked with a cane. T. 161, 261-62, 392-95, 424. An MRI showed an idiopathic leftward curvature of the lumbar spine and degenerative disc bulging at L2-3, L3-4, and L4-5. T. 462. Motor nerve conduction studies showed electrophysiological evidence of mild chronic changes in C-5 and C-6 supplied muscles on the right. T. 478.  On September 26, 2003, a CT lumbar myelogram showed minimal concentric  bulging at the L3-4 and L4-5 levels with no disk herniation. T. 503-04. There is thus abundant evidence in the record to support Dr. Socolof's, as well as Dr. Fagelman's,

14

opinion and the ALJ failed to give sufficient reasons for rejecting such opinions.

Therefore, the ALJ failed to accord the opinions of Cleavland's treating sources appropriate weight.

### C.  Credibility

Cleavland contends that the ALJ's decision to discredit her subjective complaints of pain was not supported by law. The Commissioner contends that the ALJ found that Cleavland was not disabled by pain.

The basis for establishing disability includes subjective complaints of pain even where the pain is unsupported by clinical or medical findings, provided that the underlying impairment can be "medically ascertained." 20 C.F.R. § 404.1529 (2005); Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999). A finding that a claimant suffers from disabling pain requires medical evidence of a condition that could reasonably produce pain. An ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be expected to be consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2005); Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  If there is a rejection of the claims of disabling pain, the ALJ must provide specific reasons for doing so. Saviano v. Chater, 956 F. Supp. 1061, 1071 (E.D.N.Y. 1997).

The claimant's credibility and motivation as well as the medical evidence of impairment are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978); Lewis v. Apfel, 62 F. Supp. 2d 648, 653 (N.D.N.Y. 1999) (Kahn, J.). If there is conflicting evidence about a claimant's pain where the degree of pain complained of is not consistent with the impairment, the ALJ must make credibility findings. Donato v. Secretary of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2005).

16

The ALJ here found that Cleavland's testimony regarding her complaints of pain was out of proportion with the medical evidence. T. 20. The ALJ found it significant that Cleavland had a driver's license and a vehicle which she drove two-to-three times per week. T. 20. However, the record is replete with Cleavland's complaints of pain. Cleavland testified that she could not climb stairs, needed help with the laundry, cooking, housework, yardwork, grocery shopping, and getting in and out of the tub, could only stand fifteen minutes before she experienced shooting pain in her hip which radiated down her left leg, and that she no longer was able to do any recreational activities. T. 544-48, 571. At the hearing, Cleavland's friend testified that Cleavland needed help with housework, and personal care, and that Cleavland could not remain in one position for a long period of time. T. 579.

In addition, Dr. Hazel, an examining physician, opined that Cleavland had reached maximum medical improvement.  T. 425. , Dr. Fagelman, an examining physician, found that Cleavland was permanently, totally disabled. T. 426. In addition, Cleavland sought treatment consistently from the pain clinic, underwent motor nerve conduction studies, MRIs, myelograms, CTs, sought chiropractic treatments,  her current pain medications included Vistaril, Vicodin, norco, soma, PLO gel, Trazadone and Flexeril, she used a TENS unit, underwent several epidural steroid injections and nerve blocks, had whirlpool therapy, and walked with a cane. T. 261-62, 392-95, 424. Cleavland presented to the emergency room with complaints of severe back pain with radiation down the left leg.

Cleavland's complaints of pain were thus overwhelmingly supported by the medical and other evidence in the record.  The ALJ's rejection of the credibility of Cleavland's complaints lacks sufficient record support.  The ALJ erred in rejecting Cleavland's complaints.

### D. RFC

In points two and three of her memorandum of law, Cleavland contends that the ALJ erred in determining her mental RFC.

RFC describes what a claimant is capable of doing despite his or her impairments. 20 C.F.R. § 404.1545(a) (2002).  "RFC is determined by considering all relevant evidence consisting of, inter alia, [the claimant's] physical abilities, symptoms including pain . . . [or other] limitations which go beyond symptoms." Martone, 70 F. Supp. 2d at 150 (citing 20 C.F.R. §§ 404.1545, 416.945 (1991)).  Basic work activities which are relevant for evaluating the severity of a mental impairment include the ability to understand, carry out, and remember simple instructions, and the ability to respond appropriately to supervision, co-workers, and usual work situations. 20 C.F.R. §§ 404.1521(b)(1)-(5) (2005); Pickering v. Chater, 951 F. Supp. 418, 424 (S.D.N.Y.1996).  In assessing RFC, the ALJ must make findings specifying what functions the claimant is capable of performing, not simply making conclusory statements regarding the claimant's capabilities.  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work or other work in the national economy.  State of N.Y. v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); see generally 20 C.F.R. §§ 404.1520 (2002), 416.960 (2002).

Here, the ALJ found that Cleavland suffered from severe mental health impairments and had mild-to-moderate limitations in dealing with work stress, understanding, remembering, and carrying out detailed instructions, and maintaining attention and concentration. T. 18. There is substantial evidence in the record to support this finding, which is consistent with Cleavland's symptoms and the findings of examining and non-examining physicians. Cleavland complained of depression, inability to concentrate, problems sleeping, poor appetite, and related a background of physical and sexual abuse. T. 315.

Dr. Socolof found a marked degree of limitation in activities of daily living, maintaining social functioning, a constant degree of limitation in deficiencies of concentration, persistence or pace, and repeated episodes of deterioration and decompensation in work settings. T. 465-67. Dr. Clements found that Cleavland's mood was dysphoric, affect was appropriate but somewhat constricted, that her insight, common sense and social judgment were limited, she was orientated in three spheres, able to perform serial sevens, immediate memory was somewhat limited, and she could recall two of five items. T. 286. The diagnosis was adjustment disorder with depressed mood, secondary to medical problems. T. 286.

A psychiatric review technique form found that Cleavland had no severe impairment. T. 288-96. A social and psychiatric history and assessment form found that Cleavland was orientated times three, had problems with memory, her intellectual functioning was average, that her insight and judgment were intact, that she was depressed, and had a functional disability due to mental illness in self-care, self-direction,

social functioning, and ability to concentrate. T. 306-10. Dr. Nicholson diagnosed a

recurrent, moderate, major depressive disorder and posttraumatic stress disorder. T. 316.

Cleavland was started on serzone for depression and therapy was recommended. T. 317.

While there was significant conflicting evidence on this issue, it is clear from the record

that substantial evidence supported the ALJ's finding here.  Accordingly, it is

recommended that the Commissioner's finding in this regard be affirmed.


## VI. Remand or Reversal

A reviewing court has the authority to reverse with or without remand.  42 U.S.C. §§

405(g), 1383(c)(3) (1999).  Remand is appropriate where there are gaps in the record or

further development of the evidence is needed.  Curry, 209 F.3d at 124.  Reversal is

appropriate, however, where there is "persuasive proof of disability" in the record and

remand for further evidentiary development would not serve any purpose.  Id.; see also

Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Here, the evidence of Cleavland's

disability was overwhelming and no gaps appear in the record.  Accordingly, it is

recommended that the decision of the Commissioner be reversed rather than remanded

for further proceedings and that Cleavland's claim be granted.


## VII. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **REVERSED**,

Cleavland's motion for a finding of disability be **GRANTED**, and the Commissioner's cross-

20

motion be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED: November 28, 2005
        Albany, New York

United States Magistrate Judge

21